**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Christine M. Arguello**

Civil Action No. 12-cv-02908-CMA

AMY A. GIULIANO,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

      Defendant.

---

**ORDER AFFIRMING DENIAL OF SOCIAL SECURITY BENEFITS**

---

    This matter is before the Court on Plaintiff Amy A. Giuliano's appeal of the Defendant's May 23, 2011 decision denying her claim for Supplemental Security Income ("SSI") pursuant to Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 1381-83. Jurisdiction is proper under 42 U.S.C. §§ 405(g) and 1383(c)(3).

## I. BACKGROUND

    Plaintiff was born on October 18, 1969, and was 39 years old when she filed her application for SSI on November 17, 2008.  (AR 17.)[1]  She has an associate's degree in business management (AR 27) and has previously worked as an accounts payable clerk, a court clerk, and an order taker (AR 17).  Plaintiff was terminated from her position as a court clerk in August 2007, which is when she claims her disability began.  (AR 140.)  In her November 17, 2008 Disability Report, Plaintiff stated, among other

---

[1] Citations to the Social Security Administrative Record, which is found at Doc. # 8, will be to "AR" followed by the relevant page number(s).

things, that she "live[s] everyday with a migraine" and that she "ha[s] a migraine

everyday," which makes it "hard to concentrate and sometimes see." (*Id.*)  In her

October 22, 2009 Disability Report, Plaintiff stated that her condition had not changed

since November 17, 2008.  (AR 179.)

After Plaintiff's SSI application was denied, she requested a hearing, which was

held by video conference before an Administrative Law Judge ("ALJ") on March 15,

2011.[2]  (AR 23-52.)  Plaintiff, who was represented by counsel, and a vocational expert

testified at the hearing.  (*See id.*)  Plaintiff averred that her migraines last from "two to

three days" (AR 39) and that she has to lie down for "about six to eight hours" with a

black mask over her eyes when the migraines start (AR 41).  Plaintiff further testified

that, since she applied for SSI, her migraines had "gotten more intense" and would

"come on quicker."  (AR 44-45.)

On May 23, 2011, the ALJ issued a decision, finding that Plaintiff was not

disabled at any time since November 17, 2008.  (AR 18.)  According to the standard

five-step sequential evaluation process used in Social Security cases, the ALJ

determined that:

1. Plaintiff "has not engaged in substantial gainful activity" since she applied for SSI

   [Step 1];

2. Plaintiff's migraine headaches constitute a "severe impairment" [Step 2];

---

[2] The ALJ presided over the hearing from Colorado Springs, Colorado, while Plaintiff appeared
in Pueblo, Colorado.  (AR 12.)

3. Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)" [Step 3];

4. Plaintiff has the residual functional capacity ("RFC") to "perform a full range of work at all exertional levels," subject to the following nonexertional limitations: she would "require simple, unskilled work with a specific vocational preparation (SVP) of one or two"; she should "avoid flashing lights"; she should "not perform work requiring constant use of fine vision"; and she should "avoid high noise environments";

5. Although Plaintiff's "medically determinable impairments could possibly be expected to cause the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms were inconsistent with the above [RFC] assessment and therefore not credible";

6. Plaintiff is "unable to perform any past relevant work" [Step 4]; and

7. Given Plaintiff's "age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [she] can perform."

(AR 14-18.)  Thereafter, Plaintiff filed a request with the Appeals Council for review, which was denied on September 5, 2012.  (AR 1-5.)

On November 5, 2012, Plaintiff filed a Complaint, seeking judicial review of the denial of Social Security benefits.  (Doc. # 1.)  The Social Security Administrative

Record was filed on March 8, 2013.  (Doc. # 8.)  Plaintiff submitted her opening brief on

April 25, 2013.  (Doc. # 12.)  Defendant, the Acting Commissioner of Social Security,

responded on June 5, 2013 (Doc. # 13), and Plaintiff replied on June 18, 2013 (Doc.

# 14).  On September 4, 2013, the Court held a hearing in this matter, and both parties

argued their respective positions.  (*See* Doc. # 18.)

In this appeal, Plaintiff contends that the ALJ committed legal errors and that her

decision was not supported by substantial evidence.  Specifically, Plaintiff argues that

the ALJ erred by:

1.  Not having proper reasons for discounting and declining to follow the opinion of
    Plaintiff's treating physician;

2.  Failing to base Plaintiff's RFC on any evidence in the record; and

3.  Lacking a sufficient basis for her credibility determination of Plaintiff.

(*See* Doc. # 12.)

## II.  **APPLICABLE LAW**

### A.   **STANDARD OF REVIEW**

The record in this case is composed of the evidence that was considered by the

ALJ.  The Court's review is limited to determining whether the ALJ's decision is

supported by substantial evidence and whether the Acting Commissioner – through the

ALJ – applied the correct legal standards.  *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th

Cir. 2009).  Substantial evidence is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.  It requires more than a scintilla, but less

than a preponderance.  *Id.* at 1052.  In reviewing the record, the Court does not reexamine the issues *de novo*, *Sisco v. United States Department of Health & Human Services*, 10 F.3d 739, 741 (10th Cir. 1993), nor does it re-weigh the evidence or substitute its judgment for that of the Defendant, *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006).  Thus, even when some evidence may have supported findings contrary to those that the ALJ made, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court may have "made a different choice had the matter been before it *de novo*."  *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007) (quotation marks and citations omitted).

## B.    EVALUATION OF DISABILITY

An individual's eligibility for SSI payments each month is determined on the basis of his income, resources, and other relevant characteristics.  42 U.S.C. § 1382(c)(1). In addition to being financially eligible, the individual must file an application for SSI and be under a "disability" as defined in the Act, which states that the individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. §§ 423(d)(2)(A) & 1382.  The disabling impairment must last, or be expected to last, for a continuous period of not less than 12 months.  *Id.* at § 1382c(a)(3)(A).

# III.  ANALYSIS

In determining whether a claimant is disabled, the ALJ must engage in the following five-step inquiry: (1) whether the plaintiff is currently employed; (2) whether the plaintiff has a severe impairment; (3) whether the plaintiff's impairment is one that the Commissioner considers conclusively disabling by meeting the requirements of a listing; (4) if the plaintiff does not have a conclusively disabling impairment, whether she can perform her past relevant work, and (5) whether the plaintiff is capable of performing any work in the national economy.  20 CFR § 416.920(a)(4).  The plaintiff bears the burden of establishing a disability at Steps One through Four.  *See, e.g.*, *Gonzales v. Astrue*, No. 11-cv-02344, 2012 WL 4356243, at *2 (D. Colo. Sept. 24, 2012) (unpublished).  If the claimant reaches Step Five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy."  *Id.*

## A.     THE ALJ'S EVALUATION OF PLAINTIFF'S TREATING PHYSICIAN

Plaintiff first contends that the ALJ did not have proper reasons for discounting and declining to follow the opinion of Plaintiff's treating physician.  (Doc. # 12 at 9-20.) The Court disagrees and determines that substantial evidence supports the ALJ's decision as to this physician.

"The ALJ, not a physician, is charged with determining a claimant's residual functional capacity based on the medical record."  *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004).  Nevertheless, according to the "treating physician rule," the

Commissioner will generally "give more weight to medical opinions from treating

sources than those from non-treating sources." *Langley v. Barnhart*, 373 F.3d 1116,

1119 (10th Cir. 2004); *see also* 20 CFR. § 416.927(c)(2).  In fact, "[a] treating physician's

opinion must be given substantial weight unless good cause is shown to disregard it."

*Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 289-90 (10th

Cir. 1995).  A treating physician's opinion is accorded this weight because of his unique

perspective to the medical evidence that cannot be obtained from the objective medical

findings alone or from reports of individual examinations.  *See Robinson v. Barnhart*,

366 F.3d 1078, 1084 (10th Cir. 2004).

"In deciding how much weight to give a treating source opinion, an ALJ must first

determine whether the opinion qualifies for 'controlling weight.'" *Watkins v. Barnhart*,

350 F.3d 1297, 1300 (10th Cir. 2003).  To do so, the ALJ:

> must first consider whether the opinion is well-supported by medically
> acceptable clinical and laboratory diagnostic techniques.  If the answer to
> this question is 'no,' then the inquiry at this stage is complete.  If the ALJ
> finds that the opinion is well-supported, he must then confirm that the
> opinion is consistent with other substantial evidence in the record.  [. . .]
> [I]f the opinion is deficient in either of these respects, then it is not entitled
> to controlling weight.

*Id.* (internal quotation marks and citations omitted).

Even if a treating physician's opinion is not entitled to controlling weight,

however, "[t]reating source medical opinions are still entitled to deference and must be

weighed using all of the factors" found in 20 CFR § 416.927(c).  *Id.*  Those factors are:

> (1) the length of the treatment relationship and the frequency of
> examination; (2) the nature and extent of the treatment relationship,

7

including the treatment provided and the kind of examination or testing
performed; (3) the degree to which the physician's opinion is supported by
relevant evidence; (4) consistency between the opinion and the record as
a whole; (5) whether or not the physician is a specialist in the area upon
which an opinion is rendered; and (6) other factors brought to the ALJ's
attention which tend to support or contradict the opinion.

*Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001); 20 CFR § 416.927(c).

Under Tenth Circuit caselaw, "an ALJ must give good reasons for the weight assigned to

a treating physician's opinion that are sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the treating source's medical

opinion and the reason for that weight." *Langley*, 373 F.3d at 1119 (internal quotation

marks and citations omitted).

In the instant case, the record contains two questionnaires filled out by

Dr. Richard Gamuac. (AR 251; 314.) In the first questionnaire, dated October 13, 2009,

Dr. Gamuac states that: Plaintiff experiences a migraine headache two to three times

per week; the headaches last 48 to 72 hours; they occur notwithstanding Plaintiff's use

of prescription medication; and Plaintiff would not be able to function on the job when

having a migraine because of blurred vision and sensitivity to light and noise. (AR 251.)

In the second questionnaire, which is dated February 28, 2011, Dr. Gamuac asserts that

he continues to agree with the answers he gave in the previous questionnaire and that,

in addition to such answers, Plaintiff's migraines increase in frequency when she reads

paperwork or views a computer monitor. (AR 314.) When addressing these

questionnaires, the ALJ stated that she reviewed them but gave them "little, and

certainly not controlling, weight." (AR 16-17.) She "found that these questionnaires

were not entitled to controlling weight as the limitations purportedly attributable to

[Plaintiff's] migraines were inconsistent with not only Dr. Gamuac's treatment records,

which revealed relatively stable and effective treatment, but also the records from

[Plaintiff's] primary care facility and her own activities as described." (AR 17.)  The

Court will address, in turn, each reason the ALJ articulated – first as to controlling

weight, and then in light of the weight the ALJ actually assigned the questionnaires.[3]

      1.   <u>Controlling Weight</u>

        a)    *Inconsistency with Dr. Gamuac's own treatment notes*

Plaintiff first went to Dr. Gamuac on June 30, 2009.  (AR 200-202.)  At that time,

Dr. Gamuac's impression was that Plaintiff "suffered chronic headaches consistent with

migraines," which Plaintiff described as "moderate to severe," but which responded to

a certain pharmaceutical drug called Maxalt.  (*Id.*)  Plaintiff next saw Dr. Gamuac on

August 6, 2009, at which point the doctor: noted that diagnostic testing Plaintiff had

undergone revealed no epileptic activity; observed normal physical and neurological

responses during an examination he conducted; and increased Plaintiff's medication

dosage.  (AR 246-247.)  The third and final time Plaintiff visited Dr. Gamuac was on

October 13, 2009 – three-and-a half months after she began seeing him.  (*See* AR 241-

242.)  His treatment notes for that visit indicate normal physical and neurological

functioning and that Plaintiff had some success controlling her headaches with the

---

[3] Despite the fact that Dr. Gamuac identified no clinical or laboratory diagnostic techniques in support of his opinion, the ALJ only focused on the latter part of the controlling-weight inquiry: *i.e.*, whether the opinion was consistent with other substantial evidence in the record.  (*See* AR 17.)  As such, the Court likewise confines its analysis to this question.  *See, e.g.*, *Robinson*, 366 F.3d at 1084 (ALJ's decision must be evaluated "solely on the reasons stated in the decision").

increased medication dosage but also suffered some side effects as a result.  (*Id.*)

The doctor indicated that Plaintiff should return for a follow-up visit after two months.

(AR 242.)  As the ALJ was clearly aware, however, the record discloses no subsequent

visits by Plaintiff to Dr. Gamuac.[4]  (AR 16 (observing that Dr. Gamuac's "last treatment

record was in late 2009").)

 As against this factual backdrop, the Court cannot say that a reasonable mind

would necessarily reject the ALJ's determination that the limitations imposed by

Dr. Gamuac's questionnaires were inconsistent with his own treatment notes.  Those

treatment notes do not substantiate the length or severity of the migraines as related by

Dr. Gamuac in his questionnaires, nor do they reflect a concern over blurred vision or

that Plaintiff's migraines increase when she reads paperwork or views a computer

monitor.  *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir.

1994) (explaining that the ALJ reasonably rejected a treating physician's opinion which

was not supported by his own office records).  Moreover, the treatment notes indicate

---

[4] Plaintiff faults Defendant for "only looking at the treatment notes from Dr. Gamuac that appear in the record."  (Doc. # 14 at 5.)  According to Plaintiff, "some of Dr. Gamuac's treatment notes are missing from the record."  (*Id.*)  To the extent Plaintiff means to imply that Defendant is to blame for the absence of such records, assuming any exist, Plaintiff errs.  To be sure, ALJs have a basic duty to develop a full and fair record.  20 C.F.R. § 416.912(d) (stating that "[b]efore we make a determination that you are disabled, we will develop your complete medical history for at least the 12 months **preceding** the month in which you file your application" (emphasis added)).  However, "the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); 20 C.F.R. § 416.912(c) ("Your responsibility.  You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled.").  Accordingly, the ALJ in this case was required to develop Plaintiff's medical history only for the 12 months prior to November 17, 2008, when Plaintiff filed for SSI.  As such, Defendant is not to blame for the absence of any treatment notes pertaining to Dr. Gamuac or for looking only at those notes contained in the record.

some success with the use of medication.  Plaintiff asserts that Dr. Gamuac's alteration

of the amount of medicine he administered to her "suggests that Dr. Gamuac's

treatment had not yet become stable and effective."  (Doc. # 12 at 12.)  But the ALJ did

not read Dr. Gamuac's treatment notes as evincing total stability and effectiveness;

rather, she found that such notes disclosed "relatively" stable and effective treatment.

A reasonable mind might accept this conclusion as adequate given the limited

fluctuations in the dosage of Plaintiff's medications, as well as the fact that no evidence

indicates Plaintiff returned to Dr. Gamuac for further treatment.[5]  The Tenth Circuit has

indicated that "[p]ersistent attempts to find relief from pain . . . [are a] relevant indicator[]

of pain." *Williams v. Bowen*, 844 F.2d 748, 756 (10th Cir. 1988); *accord* SSR 96-7p

("persistent attempts . . . to obtain relief of pain . . . may be a strong indication that the

symptoms are a source of distress to the individual").  Although, as Plaintiff points out,

failure to seek treatment might stem from diverse causes (Doc. # 14 at 4), one

reasonable conclusion is that such failure indicates an absence of symptoms causing

the alleged distress – or, at the very least, symptoms less severe than alleged.

---

[5] The Court reject's Plaintiff's assertion that "the ALJ did not find that plaintiff stopped treating with Dr. Gamuac in late 2009." (Doc. # 14 at 6.)  Such a finding is implicit in the ALJ's discussion of the medical record.  Again, the ALJ noted that the last treatment record from Dr. Gamuac occurred in late 2009.  (AR 16.)  Plaintiff asserts that other evidence in the record indicates she continued to treat with Dr. Gamuac after that time.  (Doc. # 14 at 5-6.)  For instance, she cites to an October 5, 2010 MRI, but that document merely lists Dr. Gamuac as the referring physician without further elaboration.  (AR 312.)  Additionally, although Plaintiff testified that she saw Dr. Gamuac "[e]very two months" since "October of 2009" (AR 34), the ALJ did not find her testimony fully credible (as addressed below) which, considering the lack of supporting documentation on this issue, does not constitute reversible error.  *See Oldham*, 509 F.3d at 1258 (courts must defer to agency's decision when faced with conflicting views).

Accordingly, the ALJ's determination that Dr. Gamuac's opinion is inconsistent with his own treatment notes is supported by substantial evidence.

    b)  *Inconsistency with records from Plaintiff's primary care facility*

    Before Plaintiff treated with Dr. Gamuac, she visited both neurologist Dr. Sumant Rawat and her primary care facility, the Pueblo Community Health Center ("PCHC"), to obtain relief from her migraines.  (*See* AR 16 (citing relevant portions of the record).)  According to the record, and as is evident in the ALJ's discussion of Plaintiff's medical treatment, prior to filing for SSI on November 17, 2008, Plaintiff's last doctor's visit was on October 10, 2007 – *i.e.*, more than a year before her filing date.  (AR 16; 218.)  After that visit, the record discloses "approximately a two year absence" before Plaintiff again sought care for her migraines.  (AR 16; 200.)  When Plaintiff resumed such care in June 2009, she asked to be referred to another neurologist, which is when she started treating with Dr. Gamuac.  After her three-and-a half month treatment relationship with Dr. Gamuac, Plaintiff continued to be seen on occasion at the PCHC for various maladies.  (AR 16 (citing AR 302-311).)  No complaints of headaches were noted during her September 25, 2009 or November 19, 2009 appointments.  (AR 308-09.)  At her January 20, 2010 visit, Plaintiff complained of a "stomachache ongoing for about 5 days now[,]" as well as "some headaches for the last 2 days."  (AR 306.)  With regard to the headaches, the attending physician noted: "Likely migraine headache worsening due to abdominal pain."  (AR 307.)  The doctor instructed Plaintiff to "[f]ollow up with her neurologist should her symptoms not improve for her headaches."  (*Id.*)  As previously

noted, the record reveals no such follow-up.  Treatment notes from Plaintiff's February 4, 2010 visit indicate that an ultrasound revealed Plaintiff to be suffering from gallstones. (AR 303.)  The treatment notes for that appointment do not reflect any complaints by Plaintiff regarding her migraines.  (*See id.*)  Nor does the record indicate that Plaintiff complained about her migraines during a February 15, 2010 repeat visit for abdominal pain.  (*See* AR 305.)  Later, at an August 4, 2010 visit to the PCHC, Plaintiff did complain about her migraines, and the examining physician noted that Plaintiff was set to have an MRI performed.  (AR 302.)  The results of that October 5, 2010 MRI indicated that Plaintiff's brain "appears developmentally normal."  (AR 312.)

Given the limited migraine-related information disclosed by the treatment records from PCHC, the ALJ reasonably concluded that Dr. Gamuac's limitations were inconsistent with such records.  The PCHC records do not confirm the frequency, duration, or severity of Plaintiff's headaches, as recounted by Dr. Gamuac's questionnaires, nor do they offer support for the limitations he articulated.  To the contrary, the absence of any reference to Plaintiff's migraines in several of the treatment notes suggests that, contrary to Dr. Gamuac's opinion, Plaintiff was not experiencing migraine symptoms to the degree he opined.  As opposed to Dr. Gamuac's opinion that Plaintiff experienced a migraine two to three times per week, each lasting 48 to 72 hours – which equates, even on the low end, to a migraine headache well more than 50% of the time – the PCHC treatment notes discussed above disclose that only during one-third of Plaintiff's visits did she complain of her migraines.  As such, a reasonable

mind could accept the ALJ's conclusion that Dr. Gamuac's opinions were inconsistent

with the PCHC records.

        c)     *Inconsistency with Plaintiff's activities*

      The ALJ recounted Plaintiff's testimony regarding her activities of daily living as

follows:

> [Plaintiff] was a single mother of a pre-teen daughter.  She resided in a
> townhouse with her daughter and was able to care for her daughter and
> perform the household activities necessary for maintaining her home.
> Specifically, she cooked, cleaned, was able to shop for necessary items
> and did laundry . . . .  She also had a driver's license and drove as
> necessary, including taking her daughter to and from school.  [Plaintiff]
> also continued to engage in numerous other activities, including reading
> with her daughter, watching television, going to the movies, attending her
> daughter's school concerts, going to the park and attending family
> activities.

(AR 16 (citations omitted).)

      These activities, which Plaintiff indeed testified to being able to perform, can

reasonably be seen as inconsistent with Dr. Gamuac's questionnaires.  The frequency

with which Dr. Gamuac said Plaintiff experiences migraines spans from four days per

week (*i.e.*, two headaches a week that last for 48 hours each) to more frequently than

on a daily basis (*i.e.*, three headaches a week that each last for 72 hours).  The

inconsistency between such a high level of recurrence, on the one hand, and Plaintiff's

descriptions of her activities, on the other, was a valid reason for the ALJ to discount Dr.

Gamuac's opinions.  *See, e.g.*, *Castellano*, 26 F.3d at 1029.  Plaintiff attempts to counter

this point by stating that the ALJ "only consider[ed] plaintiff's activities when she is free

of a migraine."  (Doc. # 12 at 14.)  But that argument betrays the very problem identified

14

by the ALJ – namely, that Plaintiff's complaints of living "everyday with a migraine" (AR

140; *see* AR 179), and Dr. Gamuac's concomitant opinions, do not reflect the reality, as

evidenced in Plaintiff's activities of daily living, that Plaintiff does not constantly suffer

from migraine headaches.

As such, the Court determines that substantial evidence in the record supports

the ALJ's reasons for not according controlling weight to Dr. Gamuac's opinions.

2.   Little Weight

Plaintiff next contends that the ALJ "only explained why she denied controlling

weight to Dr. Gamuac's opinion, but never explained why she gave it little weight."

(Doc. # 12 at 15 (emphasis deleted).)  The Court is not persuaded and, given the

context of the ALJ's opinion, views Plaintiff's argument as elevating form over

substance.

Although ALJs are required to weigh the opinions of treating physicians,[6] which

have not been accorded controlling weight, by using all of the § 416.927(c) factors, the

---

[6] Whether Dr. Gamuac should even be considered a treating physician is less than certain.  A treating physician is one who provides the claimant with medical treatment and who has "an ongoing treatment relationship" with the claimant.  20 C.F.R. § 416.902.  Such a relationship is demonstrated by evidence which establishes that the claimant sees the physician "with a frequency consistent with accepted medical practice for the type of treatment" required.  *Id.*  The regulations state: "We may consider an acceptable medial source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment . . . is typical for your condition(s)."  *Id.*  The limited nature of Dr. Gamuac's treatment of Plaintiff – three visits in about as many months – calls into question whether the rationale underlying the treating physician rule can support applying such a label to Dr. Gamuac here.  In any event, though, ALJ's are still required to consider the § 416.927(c) factors for non-treating physicians.  As such, the Court's analysis remains the same, whether or not Dr. Gamuac was truly a treating physician.  *See, e.g., Doyal v. Barnhart*,

Tenth Circuit does not mandate a wooden approach to application of the regulations, in general, or to this requirement, in particular.  In *Davis v. Erdmann*, 607 F.2d 917, 919 n.1 (10th Cir. 1979), the court explained that, although it "may not supply a reasoned basis for the agency's action that the agency itself has not given," the court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." And in *Oldham*, 509 F.3d at 1258, the Court recognized that an ALJ's decision need not "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."  *See also Branum v. Barnhart*, 385 F.3d 1268, 1275-76 (10th Cir. 2004) (affirming weight given to treating physician despite not all six factors being mentioned); *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001) (similar).  The *Oldham* court's statement comes perhaps as little surprise, given the Commissioner acknowledgment that "[n]ot every factor for weighing opinion evidence will apply in every case."  SSR 06-03P.

In the instant case, the ALJ did not expressly apply the § 416.927(c) factors, but her opinion contains good reasons that are sufficiently specific to make clear why she gave Dr. Gamuac's opinions little weight.  *See Langley*, 373 F.3d at 1119.  To begin with, the ALJ discussed each of the three visits Plaintiff made to Dr. Gamuac, which the ALJ's opinion shows were confined to a three-and-a-half month period.  (*See* AR 16.)  This discussion indicates that neither the length nor the frequency of the treatments for which Plaintiff saw Dr. Gamuac were substantial.  *See, e.g.*, *Doyal v. Barnhart*, 331 F.3d 758,

331 F.3d 758, 764 (10th Cir. 2003) (despite holding physician not to be a treating physician because of a limited number of treatments, court still considered the relevant weighing factors).

764 (10th Cir. 2003) (court found two treatments to be insubstantial, characterizing the

basis of the plaintiff's relationship with the physician as "fleeting").   Additionally, the ALJ

described the nature and extent of Plaintiff's limited relationship with Dr. Gamuac as

generally consisting of the mere management of medications Plaintiff had been on for

years.   (*See* AR 16.)   Further, the ALJ's juxtaposition of Plaintiff's hearing testimony with

Dr. Gamuac's opinions makes clear the lack of support for his opinions that the ALJ

observed in Plaintiff's testimony.   Likewise, as previously discussed, the ALJ validly

discredited Dr. Gamuac's opinions based on the tension between them and Dr.

Gamuac's own treatment notes and Plaintiff's PCHC records, both of which are relevant

pieces of evidence.   Also, along with Plaintiff's description of her daily activities, "most

persuasive" to the ALJ was the "longitudinal records" as a whole.   (*Id.*)   As framed by the

ALJ, this macro view of Plaintiff's treatment reveals a patient who allegedly suffers from

daily debilitating migraines but who will frequently go months and years without seeking

treatment for her condition.   (*See id.*)   Thus, and as already stated, a reasonable mind

could easily agree with the ALJ that the record as a whole is inconsistent with the

restrictive opinions given by Dr. Gamuac.   Regarding the last two factors, the record

reveals that Dr. Gamuac is a specialist in neurology; however, the ALJ implicitly noted

that his opinions were not presented in the traditional form of medical opinions but,

rather, were given via "questionnaires."   (*See* AR 16-17.)   Opinions in such form are

subject to being given less weight, especially when they conflict with the record.   *See,*

*e.g.*, *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987) (noting that check-the-box

forms, "standing alone, unaccompanied by thorough written reports or persuasive testimony, are not substantial evidence").  In light of these reasons, the Court is not left guessing as to why the ALJ gave Dr. Gamuac's opinions little weight.

      3.    <u>Recontacting Dr. Gamuac</u>

      The Court rejects Plaintiff's assertion that the ALJ should have recontacted Dr. Gamuac to clarify the basis of his opinion.  (Doc. # 12 at 19-20.)  According to the regulations in existence at the time of the ALJ's decision, additional information from a treating source is required when the existing information "is inadequate for [the ALJ] to determine whether [the claimant] is disabled."  20 C.F.R. § 416.912(e).[7]  Here, the ALJ was able to determine that Plaintiff was not disabled.  The decision was based, in part, on the conflict between Dr. Gamuac's opinions and his treatment notes; but it was also based on the conflict between such opinions and the record as a whole, which failed to support Dr. Gamuac's opinions that Plaintiff suffered nearly constant migraines.  As opposed to *Robinson*, 366 F.3d at 1084, in which the treating physician failed to give a reason for his opinion that the plaintiff in that case was unable to work, here the ALJ reasonably found that the explanation given by Dr. Gamuac for his opinions simply was not supported by the record.  Accordingly, the need to recontact Dr. Gamuac was not triggered.

---

[7] This regulation was replaced on March 26, 2012, by a similar regulation at 20 C.F.R. § 416.920b(c)(1).

**B.     WHETHER ANY RECORD EVIDENCE SUPPORTS THE ALJ'S RFC
        ASSESSMENT**

Plaintiff next contends that the "ALJ's RFC finding is not supported by any

evidence in the record."  (Doc. # 12 at 25 (emphasis and capitalization deleted).)

The Court disagrees.

An ALJ's RFC determination is "an assessment of an individual's ability to do

sustained work-related physical and mental activities in a work setting on a regular and

continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a

week, or an equivalent work schedule."  SSR 96-8p.  A claimant's RFC is "the most

[she] can still do despite [her] limitations."  20 C.F.R. § 416.945(a)(1).  In defining the

proper contours for assessing an RFC, the Tenth Circuit has "rejected [the] argument

that there must be specific, affirmative, medical evidence on the record as to each

requirement of an exertional work level before an ALJ can determine RFC within that

category."  *Howard*, 379 F.3d at 949; *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir.

2012) ("there is no requirement in the regulations for a direct correspondence between

an RFC finding and a specific medical opinion on the functional capacity in question");

*McDonald v. Astrue*, 492 Fed. Appx. 875, 885-86 (10th Cir. 2012) (unpublished)

(rejecting the contention that "an ALJ is not competent, in the absence of a medical

opinion," to assess the severity of alleged symptoms and to "determine the extent of the

limitations that result based on the evidence in the claimant's medical records, her daily

activities, and her positive response to medications[,]" and stating instead that this

"is precisely the type of evidence an ALJ should consider in determining a claimant's

19

RFC").  Conversely, an ALJ is not required to include in her RFC assessment limitations

that the medical record fails to support.  *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir.

2000).

In the instant case, as previously discussed, the medical record does not support

the extreme no-work limitation imposed by Dr. Gamuac.  However, the record does

support the functional limitations assessed by the ALJ.  For instance, in her initial SSI

application, Plaintiff claimed that light is hard on her eyes when she has a headache.

(AR 140.)  She testified in that same vein during the hearing and added that sound

bothers her, too, when she has a migraine.  (AR 41.)  Likewise, Dr. Gamuac's treatment

notes indicate that Plaintiff's migraines are "often associated with sensitivity to light and

noise."  (AR 200.)  In fact, in his October 13, 2009 questionnaire, Dr. Gamuac states

the headache-related impediments to Plaintiff's employment were "blurred vision" and

"sensitivity to light [and] noise."  (AR 251.)  Accordingly, the ALJ's limitations – to "avoid

flashing lights," "not perform work requiring constant use of fine vision," and "avoid high

noise environments" – are supported by the record.[8]

---

[8] Contrary to Plaintiff's argument, the ALJ did not "reject" Dr. Gamuac's opinion due to "her own
credibility judgments, speculation or lay opinion."  (*See, e.g.*, Doc. # 14 at 15 (quotation marks,
citations, and emphasis deleted).)  As the ALJ made clear, she did not reject Dr. Gamuac's
opinion but, rather, gave it little weight.  (AR 17.)  Such weight can be seen, for example, in the
overlap between the ALJ's RFC assessment and those portions of Dr. Gamuac's records that
account for Plaintiff's sensitivity to noise and light (and related trouble seeing).

## C.     THE ALJ'S CREDIBILITY DETERMINATION OF PLAINTIFF

Finally, Plaintiff contends that the ALJ lacked a sufficient basis for finding Plaintiff to be less than fully credible.  The Court discerns no error in the ALJ's handling of this issue.

The Tenth Circuit has stated that "[c]redibility determinations are peculiarly the province of the finder of fact" and will not be upset "when supported by substantial evidence."  *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) (internal quotation marks and citation omitted).  As the ALJ recounted in this case, a two-step process is used to evaluate a claimant's credibility.  (AR 15.)  First, the ALJ must "consider whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expect to produce the individual's pain or other symptoms."  SSR 96-7P.  If this step is satisfied, the ALJ must then "evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities."  *Id.*  During this evaluation, "whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record."  *Id.* In assessing a claimant's credibility, the ALJ need not engage in a factor-by-factor recitation of the evidence.  *Qualls*, 206 F.3d at 1372.  Instead, the ALJ must merely set forth the specific evidence she relies on in evaluating the claimant's credibility.  *Id.*

"Because the determination of credibility is left to the ALJ as the finder of fact, that determination is generally binding on the reviewing court."  *McDonald v. Astrue*, No. 10-cv-00871, 2011 WL 1398928, at *7 (D. Colo. April 13, 2011) (unpublished), *aff'd*, 492 Fed. Appx. at 876.

In the instant case, the ALJ followed the two-step process described above.  After finding that Plaintiff's migraines constitute a severe impairment, the ALJ "found that while [Plaintiff's] medically determinable impairments could possibly be expected to cause the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms were inconsistent" with the functional limitations specified in the RFC.  (AR 15-16.)  In discussing Plaintiff's credibility, the ALJ referred to specific evidence in the record, including Plaintiff's hearing testimony.  Among other things, the ALJ noted that Plaintiff:

- could perform certain household tasks – such as cooking, cleaning, shopping, and doing laundry – which are necessary to maintain her townhome;

- was able to care for her daughter, including taking her to and from school, reading to her, and attending her school concerts;

- still went to the movies and to the park, watched television, and attended family functions.

(AR 16 (citations omitted).)  This evidence is relevant to the credibility of Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms.  *See, e.g.*, *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (noting that "the nature of

daily activities" can be considered in assessing credibility); *see also Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1349 (10th Cir. 1990) (non-disability determination supported by contradiction between plaintiff's assertions regarding her limitations and evidence that she had "full-time responsibility for household and parenting duties").

The ALJ also relied heavily on the "longitudinal records" in discounting Plaintiff's credibility. (AR 16.) These records include the "two year absence from treatment" discussed above, as well as the temporally limited relationship Plaintiff maintained with Dr. Gamuac. (*Id.*) This evidence is also relevant to determining Plaintiff's credibility. *See* 20 C.F.R. § 416.929(c)(4) ("we will evaluate your statements in relation to the objective medical evidence"); SSR 96-7P ("the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints"); *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988) (the "extensiveness of the attempts . . . to obtain relief" and the "frequency of medical contacts" are valid considerations that an ALJ can take into account when assessing a claimant's credibility). Plaintiff's explanations for why the record evinces only sporadic treatment do not undercut the permissibility of the ALJ's citation to these absences in treatment. Migraine pain, like pain in general, is to a certain extent a subjective phenomenon in that "no one can know how much of it a particular nerve stimulus causes another person, [but] many indicators give us some idea how much pain another is feeling." *Luna v. Bowen*, 834 F.2d 161, 165 (10th Cir. 1987). As stated in *Luna*, one

of the relevant factors that can be considered is "a claimant's persistent attempts to find relief for [her] pain . . . ." *Id.* Accordingly, the ALJ did not err in discounting Plaintiff's credibility based on her implicit finding that Plaintiff had not made persistent attempts to relieve her pain.

Further, the ALJ found Plaintiff to be less than fully credible because she had received unemployment benefits during 2009 and 2010 – *i.e.*, years during which she claimed to be disabled. (AR 14.) The ALJ explained that "the Colorado unemployment insurance program is based on the principle that only those persons who are willing and able to work are entitled to unemployment benefits." (*Id.* (citing Colo. Rev. Stat. § 8-73-107 and *Sylvara v. Indus. Comm'n*, 550 P.2d 868 (Colo. 1976)).) She concluded that, "[w]hile collection of these benefits was not dispositive, it did undercut [Plaintiff's] credibility." (*Id.* (citing *Vanatta v. Barnhart*, 327 F. Supp. 2d 1317 (D. Kan. 2004)).) The ALJ was not precluded from considering the unemployment benefits Plaintiff earned. 20 C.F.R. § 416.929(c)(3)(vii) (ALJ can consider "[o]ther factors" in weighing a plaintiff's credibility); *see Moses v. Astrue*, No. 10-cv-02824, 2012 WL 1326672, at *3 (D. Colo. April 17, 2012) (unpublished) (finding that "[t]he ALJ noted correctly that in order to receive unemployment benefits, plaintiff was required to affirm that he was willing and able to work" and that "[s]uch affirmations are inconsistent with claims of disability and thus negatively impact a claimant's credibility").

Accordingly, the Court determines that a reasonable mind could accept as adequate the evidence relied on by the ALJ in determining Plaintiff's credibility.

## IV. **CONCLUSION**

For the foregoing reasons, Defendant's May 23, 2011, decision denying Plaintiff's claim for Supplemental Security Income is AFFIRMED.  Each party shall bear its own costs and attorney fees.

DATED:  September   10  , 2013

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge